**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

WINSTON KNAUSS,

    Plaintiff,

    v.

SOLOMON DWEK,

    Defendant.

: CIVIL ACTION NO. 01-3662 (MLC)
:
: **MEMORANDUM OPINION**

**COOPER, District Judge**

The plaintiff, Winston Knauss ("Knauss"), brings this action under 46 U.S.C. § 31303, et seq. (the "Ship Mortgage Act"), for a deficiency judgment of $950,000 along with interest and costs against the defendant, Solomon Dwek ("Dwek"). The Court held a bench trial on May 23, 2005, and June 16, 2005, on the issue of whether Knauss is equitably estopped from collecting a deficiency judgment based on Knauss's conduct toward Dwek. The Court holds that Knauss is not equitably estopped from collecting a deficiency judgment from Dwek.

**BACKGROUND**

**I.   Factual Background**

    A.   Overview

Camelot Casino Cruises, Inc. ("Camelot") purchased from Knauss, in December 1998, a vessel named the "Sir Winston" a/k/a "Excalibur," later known as the "Canaveral Star" ("the Ship").

Dwek was principal owner of Camelot.[1]  (Fin. Pretrial Ord., at 2.) As part of the transaction, Dwek executed a First Preferred Ship's Mortgage ("the Mortgage") on the Ship, securing Camelot's obligation on the repayment of a debt of $950,000.  Dwek signed the Mortgage twice, once as "Vice President of Camelot Casino Cruises, Inc." and once as "Personal Guarantor."  In conjunction with the Mortgage, Dwek in his personal capacity also executed a promissory note ("the Note") for $950,000, in favor of Knauss.

Camelot defaulted on the Mortgage in mid-1999.  Camelot petitioned for bankruptcy protection (the "bankruptcy proceeding") in the United States Bankruptcy Court for the Middle District of Florida (the "Bankruptcy Court") in November 1999, at which time Camelot moved for permission to sell the Ship outside of the ordinary course of business.  The Bankruptcy Court granted the motion, and Camelot sold the Ship to Bernie Weintraub, as trustee of the Space Coast Cruises Revocable Trust ("Weintraub"), in April 2000.  Weintraub executed three documents as part of this transaction: (1) an "Assumption of First Preferred Ship's Mortgage," wherein Weintraub assumed all obligations held by Camelot, (2) a Second Preferred Ship's Mortgage, and (3) a promissory note in favor of Knauss for $950,000.  At the time of this transaction, Dwek sought to be released from his personal

---

[1] The Court bases this overview of the background facts on our memorandum opinion of October 22, 2003, unless noted otherwise.

liability as guarantor under the Mortgage and the Note, but Knauss refused to release him.

Weintraub subsequently defaulted, and in response, Knauss instituted an in rem foreclosure action against the Ship (the "admiralty action") in the United States District Court for the Southern District of Florida (the "District Court"), seeking, <u>inter alia</u>, an interlocutory sale of the Ship pursuant to 46 U.S.C. § 31325(b)(1) and 28 U.S.C. § 2004. The District Court ordered, in November 2001, that (1) the Ship be offered for private sale for 90 days, and (2) if no acceptable offer was made during that time, then the Ship was to be sold at an auction conducted by the United States Marshals Service (the "Marshals Service").

Knauss received one offer to purchase the Ship for $1.5 million. Dwek's counsel received notice of this offer. This offer was withdrawn, and Dwek alleges that neither he nor his counsel was informed that this sale did not go through. At the end of the 90-day period for private sales, the Ship was sold at a Marshals Service Public Auction on February 12, 2002, for $645,000. Dwek asserts that he was not given notice of this sale. The purchaser, Mustafa Kilic, subsequently moved to confirm the sale. Dwek objected, through his personal counsel Patrick Novack, on the grounds that the price was "grossly inadequate" and that he was prepared to bid substantially higher. After a hearing, the District Court rejected Dwek's objection and granted the motion to confirm the sale.

B. <u>Dwek's Notice</u>

Camelot petitioned for bankruptcy protection under Chapter 11 on November 15, 1999.[2] The law firm of Gray Gibbs ("Gibbs") represented Camelot in the Chapter 11 proceedings. The Bankruptcy Court approved the retention of Lau, Lane, Pieper, Conley & McCreadie, P.A. ("Lau Lane") as admiralty counsel on November 29, 2000. Camelot, through Lau Lane, intervened in the admiralty action on January 19, 2001, by filing an intervening complaint to foreclose its Second Preferred Ship's Mortgage on the Ship. The Bankruptcy Court converted the bankruptcy proceeding from Chapter 11 to Chapter 7 on July 12, 2001, and appointed Lau Lane as admiralty counsel to the Chapter 7 trustee. Herbert Donica ("Donica") was the attorney for the Chapter 7 trustee.

Dwek, after the conversion of the bankruptcy proceeding into Chapter 7, retained Gibbs to represent his interests in the bankruptcy proceeding and in connection with the admiralty action. Lau Lane moved to withdraw from the admiralty action on September 5, 2001, because it had not been paid. The District Court granted this motion on September 29, 2001, and both Gibbs and Dwek received copies of the order granting the motion. Donica filed a Notice of Withdrawal of Objection to Sale by Camelot in the

---

[2] The Court takes the following facts, concerning Dwek's legal representation and the notice he received regarding the sale of the Ship, from (1) the stipulated facts in the Final Pretrial Order, and (2) the Stipulation of Counsel Supplementing Section 3 of the Final Pretrial Order, unless noted otherwise.

admiralty action on October 2, 2001, and Gibbs received copies of this Notice.

Gibbs and Dwek also each received copies of the November 13, 2001 Omnibus Order entered in the admiralty action (the "Omnibus Order"). The Omnibus Order provided, <u>inter alia</u>, that the Ship would be put up for sale at a Marshals Service sale if there were no acceptable offers for private sale after 90 days from the date of the Order. (Fin. Pretrial Ord.; Pl. Contested Facts, at 7; Def. Contested Facts, at 13.) The ninety-first day after November 13, 2001, was February 12, 2002.

Gibbs was included on the service list of interested parties in the admiralty action on both the December 11, 2001 Motion for an Order to Approve Interlocutory Private Marshal's Sale to Horizon Cruises, LLC ("December 11 Motion") and the December 18, 2001 Notice of Filing / Notice of Compliance ("December 18 Notice"). Dwek received a copy of the December 11 Motion, and Gibbs received copies of both the December 11 Motion and the December 18 Notice.

Gibbs was not included on the service list of interested parties on the January 17, 2002 Verified Interim Status Report / Motion to Credit Bid ("Motion to Credit Bid"). Laurence Valle ("Valle"), of Valle & Craig, P.A. ("Valle & Craig"), represented Knauss in the admiralty action. Valle & Craig did not serve Gibbs with a copy of the Motion to Credit Bid. Valle & Craig included

5

Donica on the service list of interested parties on the Motion to Credit Bid and, as such, he received a copy of the Motion.  Gibbs received copies of orders entered in the admiralty action on January 30, 2002, and February 8, 2002.  Donica and Valle also received copies of the January 30, 2002 order.

The Marshals Service published notice of the date, place, and time of the public auction on February 5, 2002, and February 8, 2002.  Knauss advertised the date, place, and time of the Marshals Service sale by placing advertisements in Boats and Harbors magazine in one issue in January 2002, and in two issues in February 2002.  As noted supra, the Marshals Service sale took place on February 12, 2002, after the 90-day period set out in the Omnibus Order.

No one from Gibbs called or wrote to Valle between December 20, 2001, and February 12, 2002.  Nor did Valle or anyone from his firm call or write to Gibbs during that period.  There were no telephone calls or correspondence between Gibbs and Donica between December 20, 2001, and February 12, 2002.

Knauss and Dwek had no correspondence between December 20, 2001, and February 12, 2002.  Neither party has any records or any recollection of making any telephone calls to the other during that period.

## II.  Procedural History

Knauss brought this action on July 30, 2001.  Knauss and Dwek cross-moved for summary judgment, and the Court denied the cross motions on October 22, 2003.  In so doing, the Court found that (1) Knauss was legally entitled to seek a deficiency judgment against Dwek, and (2) Dwek remained liable for the remainder of the debt under the Mortgage.  The Court found, however, that factual issues remained for trial as to whether Knauss was equitably estopped from recovering a deficiency against Dwek.  As such, the Court held a bench trial on May 23, 2005, and June 16, 2005.  The Court invited the parties to submit written summations instead of oral summations, and the parties submitted these on August 1, 2005.

## DISCUSSION

### I.  The Deficiency Judgment[3]

The Court has found previously that (1) Dwek is liable for the remainder of the debt under the Mortgage; (2) Dwek was not entitled to the personal notice described in Paragraph 25 of the Mortgage; (3) the terms of the Mortgage do not bar this deficiency action; (4) the Ship Mortgage Act did not entitle Dwek to notice of a judicial sale as a predicate to an action for a deficiency judgment against him for the outstanding debt; and (5) Knauss

---

[3] The Court, as discussed in the October 22, 2003 memorandum opinion, will apply federal law and, where necessary, Florida law.

7

could properly seek a deficiency judgment against Dwek under 46 U.S.C. § 31325(b)(2)(B).  However, while Knauss legally may seek a deficiency judgment against Dwek, there remains an issue of equity.  Dwek asserts that Knauss is equitably estopped from recovering a deficiency from him.  The Court finds that Knauss is not equitably estopped from recovering a deficiency against Dwek.[4]

## II.  Equitable Estoppel

The doctrine of equitable estoppel

> [a]ccording to federal maritime law, . . . is grounded on a notion of fair dealing and good conscience.  It is designed to aid the law in the administration of justice where without its aid injustice might result. . . . Traditionally, the doctrine of equitable estoppel operates to preclude a party who has made representations of fact through his words or conduct from asserting rights which might perhaps have otherwise existed as against another person, who has in good faith relied upon such conduct, and has been led thereby to change his position for the worse, and who on his part acquired some corresponding right.

Gibbs ex rel. Gibbs v. Carnival Cruise Lines, 314 F.3d 125, 133 (3d Cir. 2002) (quotations and citations omitted).  Therefore, to sustain a defense of equitable estoppel, a party must show:  (1) "that it relied in good faith," (2) "on a misrepresentation of [fact by] another party," and (3) "this reliance caused it to change its position for the worse."  Id. at 128.

---

[4] To the extent that the "Discussion" portion of this memorandum opinion contains findings of fact in addition to those expressly set out under the heading "Background" they shall be deemed to be part of the findings of fact.
   The "Discussion" subsections of this memorandum opinion generally do not contain citations to the evidence except after quoted language.  The record citations are set forth in the "Background" section of this memorandum opinion.

The party claiming estoppel "must have relied on [his] adversary's conduct in such a manner as to change his position for the worse[,] and that reliance must have been reasonable in that the party claiming the estoppel did not know nor should [he] have known that [his] adversary's conduct was misleading." Heckler v. Cmty. Health Servs., 467 U.S. 51, 59 (1984) (citations and quotations omitted). "If, at the time when he acted, such party had knowledge of the truth, or had the means by which with reasonable diligence he could acquire the knowledge so that it would be negligence on his part to remain ignorant by not using those means, he cannot claim to have been misled by relying upon the representation or concealment." Id. at 59 n.10 (citation and quotations omitted); see also Brown v. Richardson, 395 F.Supp. 185, 191 (W.D. Pa. 1975) (citation and quotations omitted) ("[M]ere detrimental reliance is insufficient to support a claim of estoppel. That reliance must have been reasonable.") A party asserting a defense of equitable estoppel on the ground that he had been misled by the misrepresentations of another "must not have been misled by his own lack of reasonable care and circumspection." Brown, 395 F.Supp. at 191. Moreover, "[a] lack of diligence by a party claiming an estoppel is generally fatal. If the party conducts himself with careless indifference to the means of information reasonably at hand or ignores highly suspicious circumstance, he may not invoke the doctrine of estoppel." Id.

Dwek alleges that Knauss and Knauss's counsel misrepresented to him by both words and conduct the fact that the Ship would be sold for $1.5 million, and thus Dwek would not be liable to Knauss for any deficiency. (Dwek Proposed Findings of Fact and Conclusions of Law ("Dwek Prop. Concl.") at 22.) Dwek states Knauss provided him or his lawyer with both documentary and oral representations to this effect. (Id.) Dwek claims he asked Knauss's counsel, Julia Kennedy, to give him as much notice as possible of any potential sale of the Ship, and Kennedy did not object to this request. (Id. at 3, 7-8.) Dwek further alleges that he had been receiving all materials concerning the admiralty action, and thus reasonably expected to continue to be updated on the Ship's status. (Id. at 26-29.) Dwek claims that this reliance caused him to change his position for the worse because when Knauss allegedly failed to notify him of both the withdrawal of the $1.5 million bid and the February 12, 2002 sale, he was unable to appear to bid on the Ship. Thus, he was exposed to a large deficiency judgment when the Ship sold for substantially less than the amount secured by his guaranty.

The Court finds that Dwek cannot claim the benefit of equitable estoppel because his reliance on the alleged misrepresentations was unreasonable.[5] It is undisputed that both

---

[5] Because Dwek's reliance was unreasonable, the Court does not reach the issue of whether the alleged misrepresentations were misrepresentations of fact for the purposes of equitable estoppel.

10

Gibbs and Dwek personally received copies of the November 13, 2001 Omnibus Order in the admiralty action. (Fin. Pretrial Ord; Pl. Contested Facts, at 7; Def. Contested Facts, at 13.) The Omnibus Order provided that the Ship would be put up for sale at a Marshals Service sale if there were no acceptable offers for private sale after 90 days from the date of the Order. (Id.) The Court finds further that Dwek was not diligent in pursuing information about the status of the Ship during this 90-day period because: (1) Dwek did not contact Knauss during this period, and (2) Gibbs did not contact Valle. Dwek could have discovered that the anticipated private sale did not occur simply by contacting Knauss and asking about the Ship's status. It would have been reasonable for Dwek to do so given his potential liability if the sale of the Ship did not succeed. Assuming arguendo that Knauss or his counsel made the alleged misrepresentations, Dwek's reliance was unreasonable because Dwek acted with careless indifference to information that was readily available to him. Brown, 395 F.Supp. at 191.

Valle did not serve Gibbs with Knauss's January 17, 2002 Motion to Credit Bid in the admiralty action. Dwek asserts that this Motion "announced the demise of the private sale." (Dwek Trial Br., at 15.) Even though Dwek was not served with the Motion, he or his counsel could have discovered that the Motion had been filed by (1) contacting Knauss, (2) contacting Donica,

11

counsel for the Chapter 7 trustee, who did receive a copy of the motion, or (3) requesting docket information on the admiralty action from the District Court.  Dwek has not shown that he made any such inquiries into the Ship's status from any of these sources.  This lack of diligence is fatal to Dwek's attempt to assert equitable estoppel.

The Court finds further that Dwek received constructive notice that (1) the private sale of the Ship had not occurred, and (2) the Marshals Service public auction would take place because both the Marshals Service and Knauss advertised the upcoming Marshals Service auction.  Therefore, Dwek's reliance on the alleged misrepresentations was unreasonable because Dwek (1) was not diligent in seeking information on the Ship's status, and (2) had constructive, if not actual, notice that the anticipated private sale had fallen through and that a Marshals Service sale would occur.  Because the Court finds this reliance was unreasonable, Dwek cannot prove the elements of the defense of equitable estoppel and, thus, this defense is not available to him.  Accordingly, Knauss is not equitably estopped from seeking a deficiency judgment against Dwek.

## **CONCLUSION**

Knauss, as mortgagee under a preferred ship's mortgage, had no legal duty to provide Dwek, a guarantor, with notice of the judicial sale of the Ship as a condition precedent to seeking a

deficiency judgment.  Knauss is not equitably estopped from recovering a deficiency against Dwek.  The Court, therefore, will enter an order (1) finding in favor of Knauss, and (2) directing Knauss to submit a proposed judgment.  The Court will issue an appropriate order.

                                                    s/ Mary L. Cooper
                                              **MARY L. COOPER**
                                              United States District Judge